United States District Court
Southern District of Texas
**ENTERED**
June 11, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 5:16-CV-73** |
| | § | |
| **EDWARD S. FLUME** | § | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

Plaintiff United States of America brought this suit to recover civil penalties assessed against Defendant Edward Flume for willful failure to report his interest in a foreign bank account during tax years 2007 and 2008. The case was tried before the Court on April 23 and 24, 2019. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court finds the following facts by a preponderance of the evidence and makes the following conclusions of law. To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

**Procedural Background**

On April 5, 2016, the Government filed suit to collect penalties originally assessed against Defendant Flume by the IRS in 2014.[1] (Dkt. 1.) In August of 2018, the Court denied the

---

[1] On the Government's motion, the Court issued writs of garnishment against seven banks at which the Government suspected Flume had deposited non-exempt assets: Capital One, NA; Wells Fargo, NA; Scottrade, Inc.; Broadway National Bank; BBVA Compass (as successor-in-interest to Laredo National Bank); Fidelity Investments; and National Financial Services, LLC. (Dkts. 6, 32.) *See* 28 U.S.C. §§ 3101, 3104. The Court later quashed the writs of garnishment against Capital One, Wells Fargo, Scottrade, and Broadway because they held no significant non-exempt assets belonging to Flume. (Dkts. 37, 49.) *See* 28 U.S.C. § 3205(c)(10). In its answer to the writ of garnishment, BBVA Compass claimed that Flume's corporate account contained only $43.25. (Dkt. 11.) The Government has objected to BBVA's answer, claiming that BBVA misrepresented the date on which it received the writ and improperly permitted Flume to transfer funds out of the account. (*See* Dkts. 16, 21, 26, 30, 41, 45.) In October of 2018, Magistrate Judge John A. Kazen granted the Government's unopposed motion for a separate trial against BBVA Compass, to be held after the trial on Flume's own liability.

Government's motion for summary judgment, finding that a genuine dispute of material fact about Flume's state of mind remained for trial. (Dkt. 56; *see* Dkt. 51.) All exhibits were admitted without objection at the parties' pretrial conference before Magistrate Judge John A. Kazen, and the parties confirmed that the only issue remaining for trial was whether Flume's failure to file Reports of Foreign Bank and Financial Accounts (commonly known as FBARs) in tax years 2007 and 2008 was willful. The Court held a two-day bench trial beginning on April 23, 2019. The following individuals testified: (1) Raphaelle Johnson, the IRS agent who led the examination of Flume's tax returns; (2) Flume himself; (3) Leonard Purcell, Flume's former tax preparer, and (4) Adriana Bautista Luna, Flume's former tax preparer and Purcell's employee.

## Jurisdiction and Venue

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law. *See* 31 U.S.C. §§ 5314, 5321. Alternatively, the Court has subject-matter jurisdiction under 28 U.S.C. § 1345 because the suit was commenced by the United States, or under 28 U.S.C. § 1355 because the suit seeks enforcement of penalties incurred under federal law. Venue is proper in this District because Defendant Flume is a resident of Mexico and may therefore be sued in any federal judicial district. *See* 28 U.S.C. § 1391(c)(3).

---

(Dkt. 61; *see* Dkt. 58.) The writs of garnishment against Fidelity Investments and its subsidiary National Financial Services remain outstanding. (Dkt. 6; *see* Dkt. 18 at 1 n.1.) In its answer to the writ of garnishment, Fidelity reported that Flume's three accounts contained a total of approximately $60,000. (Dkt. 17, Attach. 2 at 2.)

### Findings of Fact

Defendant Edward Flume is a U.S. citizen who has lived and worked in Mexico since 1990.[2] (Reporter's Simultaneous Transcript Day 1 (RT1) 64:5; *see* Dkt. 75, Attach. 2 at 1, 5.) A savvy businessman, Flume has successfully parlayed his background in Texas real estate into a range of enterprises and investments in Mexico. (*See* RT1 64:10–65:19; Dkt. 75, Attach. 2 at 5.) During the 1990s, Flume owned forty-two Whataburger franchises in Mexico and oversaw a total of approximately 1,500 employees. (RT1 65:20–66:10.) To operate the franchises, Flume and a U.S.-citizen business partner incorporated Franchise Food Services de Mexico S.A. de C.V. (FFM), a Mexican limited liability stock corporation. (Pl.'s Ex. 32 at 3; Dkt. 75, Attach. 2 at 4.)

Flume sold the Whataburger franchises in the late 1990s. (RT1 66:11–13.) Since then, Flume, together with his wife Martha, business partner Victor Mendez Tornell, and Tornell's wife, has developed residential real estate in Guadalajara and San Miguel de Allende. (*Id.* at 66:14–67:7; *see* Reporter's Simultaneous Transcript Day 2 (RT2) 26:22–28:8.) In 1999, the Flumes became clients of Leonard Purcell's Mexico City-based tax-preparation firm. (RT1

---

[2] The facts contained herein were either stipulated by the parties (*see* Dkt. 75, Attach. 2) or result from the Court's evaluation of documentary evidence and witness testimony. In determining the credibility of each witness, the Court considered all the circumstances under which the witness testified, including: the relationship of the witness to the parties; any interest the witness might have in the outcome of the case; the witness's appearance, demeanor, manner of testifying, and apparent candor and fairness; the reasonableness of the witness's testimony; the opportunity of the witness to acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether any such contradiction related to an important factor in the case. *Martin v. Trend Personnel Servs.*, 2015 WL 7424757, at *1 n.1 (N.D. Tex. Nov. 23, 2015); *see also In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998) (Along with "demeanor and inflection," a court evaluating a witness's credibility "must also consider relevant documents or objective evidence that may contradict the witness's story and whether [that] story is internally consistent and plausible on its face.").

112:20–21; RT2 61:12–20.) In each tax year at issue, either Purcell himself or his employee, Adriana Bautista Luna, prepared the Flumes' U.S. tax returns. (*See* Pl.'s Ex. 1–4, 47.)

To manage his real estate projects, Flume incorporated Wilshire Holdings, Inc. in the Bahamas in 2000. (Pl.'s Ex. 23.) The following year, Flume reincorporated Wilshire Holdings in Belize, a country identified by IRS Agent Raphaelle Johnson as a "tax haven" that "advertises that they don't cooperate with the U.S. authorities" in civil tax investigations. (RT1 48:11–15; *see id.* at 27:21–28:9; Pl.'s Ex. 35.) At trial, Flume testified that he moved the company to Belize because "the Bahamas was becoming too restrictive or didn't allow these accounts."[3] (RT1 73:24–74:10.) Flume was the incorporator, president, and sole director of Wilshire Holdings. (Dkt. 75, Attach. 2 at 2.)

In 2005, Flume opened an account at Swiss UBS in Wilshire's name. (RT1 80:4–7.) According to UBS's account-opening documents, the purpose of the account was to manage the Flumes' retirement funds.[4] (Pl.'s Ex. 10 at DOJ001008; *see* RT1 77:23–78:1.) Flume and his wife were the only people with signature authority over the account, and together they owned all of Wilshire's stock.[5] (Dkt. 75, Attach. 2 at 2; *see* Pl.'s Ex. 10 at DOJ000995.) Upon opening the

---

[3] Flume claimed he made the change on the advice of Leonard Purcell, who allegedly told him that "using a Bahamas domicile [would be] best as far as no corporate income tax and what have you." (RT1 139:7–140:2; *see id.* at 73:24–74:10.) In his own testimony, however, Purcell denied having advised Flume on any business or investment matters. (RT2 110:17–22, 73:23–74:4.) Purcell's testimony is cast into doubt by the fact that Wilshire's documents were mailed to Purcell's personal post office box in Houston. (RT1 74:6–19; Pl.'s Ex. 23 at 32.) Purcell's explanation—that he merely received and forwarded corporate documents on Flume's behalf so as to avoid the unreliable Mexican mails—is somewhat less than convincing. (RT2 91:9–93:8.) At the very least, though, Flume understood that the move to Belize was a strategy to avoid taxation and government oversight.

[4] The account-opening documents indicated that the UBS account might also be used to obtain a "loan for [a] flat in Paris." (Pl.'s Ex. 10 at DOJ001008.) At trial, however, Flume vehemently denied any intention to purchase property in Paris. (RT1 78: 2–11.)

[5] Tax Court documents indicate that Wilshire's articles of incorporation were later

account, Flume signed a waiver of the right to invest in U.S. securities (Pl.'s Ex. 10 at DOJ001001), a choice Agent Johnson suggested indicated a desire to hide the account from the IRS (*see* RT1 19:25–20:16). The Flumes maintained a personal credit card linked to the UBS account (RT1 82:23–83:7) and, beginning in 2008, they transferred large amounts of money from the UBS account to their personal Banco Monex account (*see* Pl.'s Ex. 40, 46). Flume testified at trial that he opened the UBS account without the knowledge or assistance of his tax preparers (RT1 76:11–25), although he stated that he "probably" told them about the account after it was opened (RT2 36:23–37:13). Instead, he opened the UBS account on the advice of a Mexico-based UBS account representative whom he met through a mutual friend. (RT1 76:5–10; *see* Pl.'s Ex. 30 at 27.)

Despite having a legal obligation to do so, Flume failed to report his financial interest in the UBS account to the IRS in both 2007 and 2008. (Dkt. 75, Attach. 2 at 3.) In 2007, the average monthly balance of the UBS account was $899,342.02; in 2008, its average monthly balance was $718,811.24. (Dkt. 75 at 2; *see* Pl.'s Ex. 14 at DOJ000243.) By mid-2008, Flume had become aware that the IRS was investigating UBS's involvement in tax evasion on behalf of its American clients. (RT1 83:17–84:14; *see* Pl.'s Ex. 9 at DOJ000979–80.) Flume soon began transferring all his assets out of the UBS account. (RT1 84:15–97:11.) First, he directed the transfer of $245,000 into Wilshire's Laredo National Bank account, almost all of which he then moved to his personal Banco Monex account. (Pl.'s Ex. 40.) Flume then moved the UBS

---

amended to give one of Flume's Mexican business partners a 73% interest in the company and reduce Flume's personal interest to 9% and his family's total interest to 27%. (Pl.'s Ex. 32 at 4; *see* Pl.'s Ex. 30 at 22.) As the Tax Court observed, Flume's 9% interest is conspicuously close to the 10% threshold for mandatory information reporting. (Pl.'s Ex. 32 at 9–15.) *See* 26 U.S.C. § 6038; 26 C.F.R. §§ 1.6038-2, 1.6046(c)(1)(ii)(c). However, the date of that corporate amendment is unknown, and UBS was not aware of the amendment when Flume opened his account there. (Pl.'s Ex. 32 at 4–5.) Accordingly, the parties stipulated for the purposes of this trial that the Flumes were the sole owners of Wilshire. (Dkt. 75, Attach. 2 at 2; *see* RT2 1:4–24.)

account's remaining balance into a Fidelity account in the United States, most of which he subsequently transferred to himself as well. (Dkt. 75, Attach. 2 at 4; *see* Pl.'s Ex. 22 at 17; Pl.'s Ex. 46.)

In 2010, UBS ended its longtime nondisclosure practice and agreed to comply with an IRS summons by releasing the names of its American clients—among them Edward Flume—to the IRS. (RT1 5:7–17, 16:3–17:15; *see* Pl.'s Ex. 38–39.) As part of a deferred prosecution agreement with U.S. law enforcement, UBS had announced in early 2009 that it would no longer provide offshore banking services to Americans. (*See* Pl.'s Ex. 44 at 41–42.) In June of 2010, Flume filed delinquent FBARs for tax years 2006 through 2009. (Dkt. 75, Attach. 2 at 3–4; RT1 32:1–41:8; *see* Pl.'s Ex. 5–6.) Even then, however, he significantly underrepresented the value of his UBS account. (RT1 32:1–41:8, 127:16–131:17.) Moreover, despite being eligible, Flume did not apply to the IRS's Offshore Voluntary Disclosure Initiative (OVDI), which could have reduced his financial liability in exchange for full disclosure of the Swiss account. (Dkt. 75, Attach 2 at 5; RT1 18:5–23.)

Flume's tardy efforts at transfer and disclosure were insufficient to avoid IRS scrutiny. Upon receiving Flume's records from UBS, IRS agent Raphaelle Johnson began an examination of his tax filings. (RT1 15:11–14.) Johnson's investigation had three components, each of which resulted in a separate penalty assessment against Flume. First, Johnson determined that the Flumes had underreported their income in tax years 2006 through 2009. (Pl.'s Ex. 34 at 7–8; RT1 11:20–22.) The Flumes settled the 2009 assessment out of court but proceeded to trial in Tax Court on the remaining penalties. (Pl.'s Ex. 34 at 78.) The Tax Court has not yet issued an opinion in that case. Second, Johnson determined that Flume had violated his obligation to file international information returns on his holdings in FFM and Wilshire. (RT1 11:22–13:25; *see*

Pl.'s Ex. 34 at 8.) Following a trial, the Tax Court upheld the penalties assessed against him. (Pl.'s Ex. 32 at 16–17.)

Finally, and most relevant here, Johnson found that Flume had failed to file timely FBARs for his Swiss bank account in 2007 and 2008.[6] (RT1 12:1–4, 24:9–26:6.) In 2014, the IRS determined that Flume's filing failures were a willful attempt to avoid U.S. taxation (RT1 41:12–43:9) and assessed penalties of $456,509.00 (Pl.'s Ex. 19; *see* Pl.'s Ex. 20).[7] When Flume did not pay, the Government instituted this action to collect those penalties, plus accrued interest, late payment penalties, and other fees. (Dkt. 1 at 1; *see* Pl.'s Ex. 20.) In defense, Flume claims that his filing failures were inadvertent because he had no knowledge of the FBAR requirement until 2010, when he attended a financial seminar for American expatriates in San Miguel. (RT1 133:3–134:5.) By Flume's account, he called Purcell immediately after the seminar, and Purcell "coached" him on how to file the delinquent FBARs and what to include in a letter to the Treasury Department requesting leniency from tax authorities.[8] (*Id.* at 134:7–136:11; *see* RT2 25:2–10.)

---

[6] Although Flume's 2006 FBAR was also delinquent, the IRS could not assess penalties for 2006 due to the six-year statute of limitations for civil-penalty assessments. *See* 31 U.S.C. § 5321(b)(1).

[7] Specifically, the IRS assessed penalties of $356,509 for 2007 and $100,000 for 2008. (Dkt. 75 at 3.) The 2007 penalty represents half of the balance rounded to the nearest dollar of Flume's UBS account on June 30, 2008, the date the FBAR form for 2007 was due. (*Id.*) On June 30, 2009—the date Flume's 2008 FBAR became due—the UBS account had a zero balance because Flume had already transferred out all his funds. (*Id.*; *see* Dkt. 75, Attach. 2 at 4.) Because the IRS determined he had acted willfully, however, he remained subject to a $100,000 penalty. (Dkt. 75 at 3.) *See* 31 U.S.C. § 5321(a)(5)(C).

[8] When questioned about why he did not introduce this letter into evidence, Flume stated only: "It's not here but it's at my desk." (RT2 25:2–15.) In light of the numerous indicia of dishonesty in Flume's testimony, discussed more fully below, the Court credits Agent Johnson's testimony that the Treasury Department never received any such letter (RT1 51:15–19) and

At trial, Purcell and Luna, who together prepared Flume's personal income tax returns from 1999 to 2010 (RT2 6:20–25), both testified that Flume never disclosed the Swiss UBS account to them (*id.* at 51:3–55:19, 74:21–81:3). They stated they had never seen Wilshire's general ledgers listing the UBS account balance (*id.* at 55:20–56:24, 84:24–86:18; *see* Pl.'s Ex. 24–27), which were prepared by a bookkeeper in San Miguel (RT1 97:12–100:25). Purcell and Luna further testified that they sent all their clients, including Flume, a form letter each year reminding them of their obligation to report all foreign bank accounts and financial interests. (RT2 58:3–60:1, 86:19–88:13, 98:25–99:24; *see* Pl.'s Ex. 43.) Purcell and Luna both explained that because Flume's Banco Monex account was the only non-U.S. account they were aware of, they marked "Mexico" on Schedule B of his tax returns. (RT2 66:24–67:8, 81:7–18.) However, because Flume never asked them to prepare an FBAR for him—a separate service that would have incurred a separate fee—they assumed he wished to fill the forms out himself, as many of their other clients did. (*Id.* at 49:1–52:23, 72:22–73:19, 89:20–90:1.)

### Conclusions of Law

The 1970 Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act (BSA), "regulates offshore banking and contains a number of recordkeeping and inspection provisions." *United States v. Under Seal*, 737 F.3d 330, 333 (4th Cir. 2013); *see Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26–30 (1974) (discussing the legislative history of the BSA). Among those recordkeeping provisions are 31 U.S.C. § 5314 and its implementing regulations, which require U.S. residents, citizens, and business operators to annually report any interests they hold in foreign bank accounts.

---

Purcell's testimony that Flume did not call him to discuss FBARs in 2010 (RT2 90:8–91:7). *See infra* pp. 11–12.

Section 5314's reporting requirement operates in two steps. First, when filling out line 7a of Schedule B of their federal tax return, taxpayers must declare whether they have an interest in or signature authority over a foreign bank account. 2 Comisky, Field & Harris, Tax Fraud & Evasion § 11.06, at 31 (updated Nov. 2018); *see United States v. Flume*, 2018 WL 4378161, at *2 (S.D. Tex. Aug. 22, 2018). This is sometimes referred to as the "check-the-box" requirement. *See Flume*, 2018 WL 4378161, at *5. If a taxpayer checks "yes," they are directed to provide the name of the country in which that account is located and to review the instructions for filing an FBAR. *See* 31 C.F.R. § 1010.350(a).[9] FBARs are due by "June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000." *Id.* § 1010.306(c).[10] They are submitted separately from one's tax return and are processed by the Treasury Department, not the IRS. (RT1 14:9–15:4.)

The penalty for failure to file a timely FBAR varies according to the level of the taxpayer's culpability. A willful violation can result in a civil penalty of up to 50% of the balance of each foreign account or $100,000, whichever is greater. 31 U.S.C. § 5321(a)(5)(C). If a violation is *not* willful, however, the maximum penalty is only $10,000 per violation. *Id.* § 5321(a)(5)(B)(i). A claim by the Government to collect civil penalties for a willful violation of 31 U.S.C. § 5314 consists of seven elements: "(1) [the defendant] was a U.S. citizen (or other

---

[9] During the tax years at issue in this case, taxpayers submitted their FBARs by mail using Form TD F 90-22.1. *See* 31 C.F.R. § 1010.350(a). The Treasury Department has since replaced Form TD F 90-22.1 with Financial Crimes Enforcement Network (FinCEN) Form 114, which must be filed electronically through the Bank Secrecy Act E-Filing Network website. 13 Mertens Law of Federal Income Taxation § 48:161 (updated Apr. 2019); *see* Report of Foreign Bank and Financial Accounts (FBAR), Internal Revenue Serv., https://www.irs.gov/businesses/small-businesses-self-employed/report-of-foreign-bank-and-financial-accounts-fbar (updated May 6, 2019).

[10] As of the 2016 tax year, FBARs are due on April 15, not June 30. *See* Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Pub. L. No. 114-41, § 2006(b)(11), 129 Stat. 443, 458–59.

qualified person) at the time of [his] filing; (2) [he] had a financial interest in or signatory authority over the account at issue; (3) the account balance exceeded $10,000; (4) the account was in a foreign country; (5) [he] failed to disclose the account; (6) the failure was willful; and (7) the amount of the proposed penalty is proper." *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121, 124 (D.D.C. 2017); *see United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012).

In this case, the parties stipulated that only the sixth element—willfulness—was in dispute. (Dkt. 75 at 3.) The Government bears the burden to prove by a preponderance of the evidence that a defendant willfully violated the FBAR requirements. *See United States v. Garrity*, 304 F. Supp. 3d 267, 270 (D. Conn. 2018) ("[E]very court that has answered the question . . . has held that the preponderance of the evidence standard governs suits by the government to recover civil FBAR penalties."). A defendant willfully violates the reporting requirement "when he either knowingly or recklessly fails to file" an FBAR. *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018). That is, he either knows the statute applies to him and chooses to violate it, or he engages in conduct "entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* at 153 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)).

With respect to IRS requirements in particular, a person acts recklessly when he "(1) clearly ought to have known that (2) there was a grave risk that the filing requirement was not being met and if (3) he was in a position to find out for certain very easily." *Id.* (internal alterations omitted) (quoting *United States v. Vespe*, 868 F.2d 1328, 1335 (3d Cir.1989)). Willful blindness—as where a defendant consciously chooses to avoid learning about reporting

requirements—is also a form of recklessness. *See United States v. Williams*, 489 F. App'x 655, 659 (4th Cir. 2012); *Flume*, 2018 WL 4378161, at *7 & *8 n.15.[11]

Having considered the case law, the evidence in the record, and the witnesses' testimony at trial, the Court concludes for the following reasons that Flume's 2007 and 2008 FBAR filing failures were willful within the meaning of 31 U.S.C. § 5314:

1.      Flume's testimony is not credible. Numerous contradictions within his testimony raise serious doubts about his veracity. For example, Flume testified that he opened the Swiss account not to evade taxation but to avoid the consequences of bank failures in the United States. (RT1 141:6–16.) He specifically cited the collapse of Lehman Brothers as a leading cause for his concern. (*Id.* at 141:8–9.) However, as the Government pointed out on cross-examination, Lehman Brothers did not collapse until 2008—three years after Flume opened the UBS account. (RT2 14:7–10.) In fact, *no* U.S. banks failed until 2007. (*Id.* at 18:13–24; *see* Pl.'s Ex. 48.) Moreover, Flume's maintenance of numerous personal accounts in the United States and Mexico belies his supposed concern about the American and Mexican banking systems. (RT2 14:14–15:8.) At trial, Flume admitted that throughout the years in question, he maintained personal bank accounts, investment accounts, and a trust account in the United States, as well as a personal account at Banco Monex in Mexico. (*Id.*; RT1 72:9–73:5; Dkt. 75, Attach. 2 at 2.)

---

[11] *McBride* and *Williams* both accepted a "constructive knowledge" theory for proving knowing violations. *McBride*, 908 F. Supp. 2d at 1206–08; *Williams*, 489 F. App'x at 659. Under this view, "every taxpayer, merely by signing a tax return, is presumed to know of the need to file an FBAR." *Flume*, 2018 WL 4378161, at *7. The Court rejected this theory in its summary-judgment Order and the parties did not urge it again at trial, although IRS Agent Johnson's testimony did allude to it. (*See* RT1 44:17–45:19.) Citations to *McBride* and *Williams* in this Order should not be understood as a reversal of the Court's position that "[t]he constructive-knowledge theory is unpersuasive" as a justification for penalties based on knowing conduct. *Flume*, 2018 WL 4378161, at *7.

In addition, Flume has changed his account of when and how he first learned of the FBAR reporting requirement at least twice. In his 2015 Tax Court trial, Flume testified that he first learned of the requirement in 2008 or 2009. (Pl.'s Ex. 30 at 34.) At that time, he made no mention of a financial seminar. (*Id.*) Then, in his 2017 deposition in this case, he testified that Purcell told him about the FBAR reporting requirement in 2010. (RT2 12:18–13:17.) Finally, Flume testified at trial that he did not learn of the FBAR reporting requirement until he attended a financial seminar in Mexico in 2010. (*See* RT1 133:3–134:3; RT2 11:9–12:12.)

Finally, Flume's account of the discrepancies between his delinquent FBARs and the actual balance of his UBS account strains credulity. Flume testified that his FBARs consistently underrepresented the UBS account's value because he did not possess "a lot of the bank account information" in 2010 and instead had to rely on spotty documentation and memory to complete the delinquent FBARs. (RT2 10:9–16.) He admitted, however, that he had electronic access to all his UBS statements. (*Id.* at 25:19–26:4.) Moreover, the Wilshire general ledgers showing the true balance for each year were prepared by a local San Miguel bookkeeper at Flume's own request. (RT1 97:12–100:25.) It is clear to the Court that Flume could have obtained accurate records of his UBS account balance with minimal effort. His failure to do so represents, at the very least, a reckless disregard for his reporting obligations. *See Bedrosian*, 912 F.3d at 153 (articulating the standard for reckless disregard of IRS filing requirements).

In short, given the numerous inconsistencies in Flume's statements and the countervailing credible testimony of the other witnesses, the Court cannot rely on Flume's testimony. *See Norman v. United States*, 138 Fed. Cl. 189, 193 (2018) (finding that the inconsistencies and contradictions within the defendant's testimony impeached her credibility beyond repair), *appeal filed.*

2.      Particularly when viewed in light of his disingenuous testimony, Flume's financial structure reflects a sophisticated tax-evasion scheme. (*See* Pl.'s Ex. 45.) Having operated businesses in Mexico for nearly three decades, Flume has developed a detailed understanding of his personal and corporate tax obligations—and how to avoid them. *See United States v. Bohanec*, 263 F. Supp. 3d 881, 889–90 (C.D. Cal. 2016) (taking the defendants' business experience and financial sophistication into account in determining that willfulness penalties were proper). While Flume does not have formal education in law or finance, his financial literacy is well above average.

When asked about the Federal Deposit Insurance Corporation's coverage limits, for example, Flume immediately responded that all American bank accounts are insured up to $100,000. (RT2 15:21–16:7.) Flume's decision to waive his right to invest his UBS account funds in U.S. securities, though far from dispositive, also suggests that he understood—and sought to avoid—the withholding and disclosure requirements that accompany U.S. investments. (Dkt. 76 at 2; Pl.'s Ex. 10 at DOJ001001; *see* RT1 19:25–20:16.) *See Norman*, 138 Fed. Cl. at 194 (finding that the defendant "concealed her financial information from U.S. authorities by signing to waive her right to invest in U.S. securities").

Flume's testimony about the 2001 transfer of Wilshire Holdings, Inc. from the Bahamas to Belize further demonstrates his familiarity with international tax laws. (RT1 73:24–74:10.) Of course, Flume testified that he reincorporated in Belize on the advice of Purcell—a claim Purcell denies. (*Id.* at 139:7–140:2; RT2 110:17–22,73:23–74:4.) As acknowledged above, the Court has doubts about Purcell's assertion that he never advised Flume on business or investment matters. *See supra* n.3. However, it has even graver doubts about Flume's veracity. At the very least, Flume's testimony that reincorporation was necessary because "the Bahamas [had] gotten very

strict on a lot of things" demonstrates a desire to structure his finances in ways that would evade government oversight and investigation. (RT2 6:11–12.)

Flume also understands how to avoid unpleasant legal obligations. For example, even after Flume sold his Whataburger franchises in the late 1990s, FFM—the Mexican corporation he had created to manage the franchises—remained intact and continued to pay Flume's salary. When asked during his 2016 Tax Court trial to explain why his salary was coming from a defunct restaurant-operating company rather than Wilshire Holdings, Inc.—the corporation he ostensibly set up to manage his real estate business—Flume testified that he transferred money from Wilshire's real estate earnings to FFM before paying it out to himself because he did not want Mexican tax authorities to know that his income was coming from an offshore corporation. (Pl.'s Ex. 34 at 34; *see* RT1 152:9–154:1.) While it has not been established whether this structure is illegal in Mexico, Flume testified that it is "much better" under Mexican law to "receive[] your income from a Mexican corporation and not from an offshore corporation." (Pl.'s Ex. 34 at 34.) Flume also acknowledged that, despite being incorporated and doing business in Mexico, FFM had not filed Mexican tax returns since the 1990s (*id.* at 35), and at trial Purcell testified that he believed Flume disregarded his obligation to file personal income tax returns in Mexico as well (RT2 103:22–104:25).

3.   Purcell and Luna's testimony that they sent Flume an annual reminder of the foreign-account reporting requirements is credible.  (RT2 58:3–60:1, 86:19–88:13, 98:25–99:24.) Accordingly, the Court disregards Flume's assertion that he did not receive Purcell and Luna's letter in any of the years at issue (RT2 10:17–11:4) and finds that Flume was on notice of his FBAR filing obligations well before he opened the UBS account.

4.      The fact that Flume disclosed his Mexican account on Schedule B of his tax returns suggests that he was aware of the foreign-account reporting requirement and made a conscious choice not to disclose his Swiss account. (*See, e.g.*, Pl.'s Ex. 1 at 3; Pl.'s Ex. 2 at 3.) *See Kelley-Hunter*, 281 F. Supp. 3d at 123–24 (finding that the defendant demonstrated her prior knowledge of the FBAR requirements by reporting foreign accounts other than the one at issue).

5.      Together, UBS's client-contact records and Flume's trial testimony establish that Flume was aware of the IRS investigation into UBS by mid-2008. (*See* Pl.'s Ex. 9 at DOJ000979; RT1 83:17–84:14.) However, Flume did not file any FBARs until after UBS agreed to turn over its American clients' records to the IRS. (Pl.'s Ex. 5–6; Pl.'s Ex. 44 at 6–9.) This timing strongly suggests that Flume knew he was breaking the law but continued to believe he could get away with it until it became clear that U.S. authorities would learn of his Swiss account. *See Kelley-Hunter*, 281 F. Supp. at 123 (holding that willfulness penalties were proper in part because the defendant immediately filed a late disclosure form after "she received a letter from UBS in February 2009 that the bank had disclosed the existence of her account to the IRS"). Flume's awareness of the IRS investigation in 2008 also means that, at least as to tax year 2007, he was on notice of potential illegal activity at UBS at the time he filed his tax return and yet took no precautions to ensure his own compliance. *See McBride*, 908 F. Supp. 2d at 1210.

6.      Even if the Court were to accept Flume's claim that he did not know about the FBAR requirement until 2010, his testimony at trial clearly established that he acted with extreme recklessness by failing to review his tax returns before signing them. (RT1 115:21–116:10; RT2 5:9–16.) *See Bedrosian*, 912 F.3d at 152 (Willfulness "often denotes . . . conduct marked by careless disregard" about one's legal rights and duties.). The Court might be more lenient with an unsophisticated defendant who genuinely could not understand the language of his tax return.

However, as noted above, Flume is a sophisticated businessman with three decades of experience managing complex projects. His testimony that he was simply "careless with the reading of everything on the tax return" is not credible. (RT2 5:10–11.) Moreover, Schedule B's question about foreign bank accounts is simple and straightforward and requires no financial or legal training to understand. *See McBride*, 908 F. Supp. 2d at 1211 ("[B]ecause the federal tax returns contain a plain instruction regarding the disclosure of interests in foreign financial or bank accounts, the risk of failing to disclose an interest in such a foreign account is obvious."). Even the most cursory review of his tax return would have alerted Flume to the foreign-account reporting requirement.

Flume's attempt to blame Purcell and Luna for his filing failures is unavailing. First, the Court credits the tax preparers' testimony that Flume never disclosed the UBS account to them, meaning they could not have known Flume had an obligation to file an FBAR for that account. (RT2 51:3–55:19, 74:21–81:3.) As the case law recognizes, a defendant's failure to inform his accountant about the existence of a foreign account is a strong indicator of a conscious intent to violate the law. *See, e.g.*, *Bohanec*, 263 F. Supp. 3d at 890; *McBride*, 908 F. Supp. 2d at 1212.

Moreover, Flume's total "rel[iance] on [Purcell and Luna's] professional skills" is reckless in and of itself. (RT2 7:11–15.) Flume never conducted any research on Purcell or Luna's educational background or credentials, nor did he inquire as to whether they were licensed CPAs. (RT1 111:25–113:17; *see* RT2 7:1–15.) In fact, although Luna has a Mexican accounting degree and Purcell has considerable work experience in Mexican and American tax preparation, neither is a CPA. (RT2 43:11–45:5, 68:25–70:24.) Given his large international holdings and complex business arrangements, Flume was reckless in failing to investigate the credentials of the people he claims to have entrusted with his tax liability.

16 / 17

## Conclusion

For the foregoing reasons, the Court finds that Defendant Edward Flume willfully failed to disclose his interest in a foreign bank account in tax years 2007 and 2008. The IRS's assessment of $456,509.00 in penalties is therefore proper.

The Government is hereby ORDERED to submit an updated damages calculation, which must include all fees and interest the Government seeks to collect, by **June 25, 2019**. The Government is further ORDERED to advise the Court by **June 28, 2019** how it intends to proceed against the remaining Garnishees.

SIGNED this 11th day of June, 2019.

_____
Diana Saldaña
United States District Judge